MICHAEL J. STORTZ (State Bar No. 139386)
BETH O. ARNESE (State Bar No. 241186)
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, California 94105-2235
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Attorneys for Defendant
AT&T MOBILITY LLC

*Additional Counsel Listed Below*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LOUIS JIRAN AND DELORES GRESHAM, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T MOBILITY, LLC d/b/a The New AT&T f/k/a CINGULAR WIRELESS, a Delaware limited liability company, VERISIGN, INC., a Delaware corporation, M-QUBE, INC., a Delaware corporation, MBLOX, INC., a Delaware corporation, and MOBILE MESSENGER AMERICAS, INC., a Delaware corporation,<br><br>Defendants. | Case No.  CV 08 0013<br><br>**NOTICE OF REMOVAL** |

DRINKER BIDDLE & REATH LLP
50 Fremont Street
20th Floor
San Francisco, CA, 94105-2235

SF1\393271\1

1    PLEASE TAKE NOTICE that Defendants AT&T Mobility LLC, VeriSign, Inc.,

2   m-Qube, Inc., and mBlox, Inc., pursuant to 28 U.S.C. §§ 1441, 1446 and 1453, hereby

3   give notice of the removal of the above-captioned action from the Superior Court of

4   California, San Francisco County to the United States District Court for the Northern

5   District of California.  In support thereof, Defendants aver as follows:

6                           **I.    INTRODUCTION**

7        1.     On or about October 16, 2007, an action was commenced in the Superior

8   Court of California, San Francisco County, captioned *Jiran v. AT&T Mobility LLC*, Case

9   No. 07-468268.  A copy of the Summons, Complaint and all other pleadings as filed in

10   the Superior Court are attached as Exhibit A.

11       2.     Defendants AT&T Mobility LLC, VeriSign, Inc., m-Qube, Inc., and

12   mBlox, Inc. each were served with summons and the Complaint in this action on

13   December 3, 2007.  On information and belief, the remaining defendant Mobile

14   Messenger Americas, Inc. has not been served as of the date of removal.

15       3.     This action is a civil action of which this Court has original jurisdiction

16   under 28 U.S.C. § 1332, and is one which may be removed to this Court by Defendants

17   pursuant to the provisions of 28 U.S.C. § 1441.

18       4.     As more fully set out below, this case is properly removed to this Court

19   pursuant to 28 U.S.C. § 1441, because Defendants have satisfied the procedural

20   requirements for removal, and this Court has subject matter jurisdiction over this action

21   pursuant to 28 U.S.C. §§ 1332(d) and 1453.

22       5.     The Superior Court of California, San Francisco County is located within

23   the United States District Court for the Northern District of California.  Therefore, venue

24   is proper because it is the "district and division embracing the place where such action is

25   pending." 28 U.S.C. § 1441(a).

26       6.     No previous application has been made for the relief requested herein.

27   **II.    JURISDICTION PURSUANT TO CLASS ACTION FAIRNESS ACT**

28       7.     This case is subject to removal pursuant to the Class Action Fairness Act of

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

NOTICE OF REMOVAL

1   2005, 28 U.S.C. §§ 1332, 1453 ("CAFA"). CAFA grants federal courts jurisdiction over

2   qualifying class actions in which there is minimal diversity, there are 100 or more class

3   members, and the aggregate amount in controversy exceeds $5,000,000. *See* 28 U.S.C.

4   1332(d)(2)(A), 1332(d)(5)(B), 1332(d)(6).

5         8.       As set forth below, plaintiffs' complaint alleges a putative class action in

6   which: (1) there are 100 or more members in the plaintiffs' proposed class; (2) at least

7   some members of the proposed class have a different citizenship from some defendants;

8   and (3) the claims of the putative class members exceed the sum or value of $5,000,000

9   in the aggregate. Thus, this Court has subject matter jurisdiction over this action pursuant

10   to 28 U.S.C. § 1332(d).

11         9.       **Class Action Consisting Of More Than 100 Members:** In their

12   complaint, plaintiffs purport to represent a class of "all AT&T wireless telephone

13   subscribers in the nation who were charged by AT&T for mobile content services."

14   (Compl. ¶ 93(A)), and an additional class of "all wireless telephone subscribers in the

15   nation who were charged by VeriSign, m-Qube, Mobile Messenger and/or mBlox for

16   mobile content services." (*Id.* ¶ 93(B)). Plaintiffs assert that "[t]he Classes *each* consist

17   of thousands of individuals and other entities." (Compl. ¶ 94 (emphasis added)). Based

18   on these and other allegations, the aggregate number of class members in each of

19   plaintiffs' classes is greater than 100 for purposes of 28 U.S.C. Section 1332(d)(5)(B).

20         10.     **Diversity Of Citizenship:** Plaintiff Jiran is a citizen of the State of Florida.

21   (Compl. ¶ 5.) Plaintiff Gresham is a citizen of the State of Mississippi. (Compl. ¶ 6.)

22   AT&T Mobility LLC is, and was at the time plaintiffs commenced this action, a

23   corporation organized under the laws of the State of Delaware with its principal place of

24   business in the State of Georgia, and therefore, is a citizen of Delaware and Georgia.

25   VeriSign, Inc. is, and was at the time plaintiffs commenced this action, a corporation

26   organized under the laws of the State of Delaware with its principal place of business in

27   the State of California, and therefore, is a citizen of Delaware and California. m-Qube,

28   Inc. is, and was at the time plaintiffs commenced this action, a corporation organized

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

SFI\393271\1

3

NOTICE OF REMOVAL

1  under the laws of the State of Delaware with its principal place of business in the State of

2  Massachusetts, and therefore, is a citizen of Delaware and Massachusetts. mBlox, Inc. is,

3  and was at the time plaintiffs commenced this action, a corporation organized under the

4  laws of the State of Delaware with its principal place of business in the State of

5  California, and therefore, is a citizen of Delaware and California. On information and

6  belief, Mobile Messenger Americas, Inc. is, and was at the time plaintiffs commenced

7  this action, a corporation organized under the laws of the State of Delaware with its

8  principal place of business in the State of California, and therefore, is a citizen of

9  Delaware and California. Here, diversity of citizenship is met because plaintiffs and

10  Defendants are citizens of different states. *See* 28 U.S.C. § 1332(d)(2)(A).

11       11. **The Amount-In-Controversy Requirement:** Plaintiffs in this case allege

12  that Defendants have "[f]or years . . . systematically, repeatedly and without authorization

13  caused charges to be placed on customers' monthly cell phone bills" (Compl. ¶ 2.)

14  Plaintiffs further allege that such charges were placed on the bills of "thousands of

15  individuals and other entities." (Compl. ¶ 94.)

16       12. Plaintiffs have sued five separate defendants, and asserted numerous

17  theories of liability, and seek a range of broad and far-reaching relief, including

18  restitution, compensatory damages, punitive damages, attorneys' fees, and injunctive

19  relief. With respect to AT&T Mobility LLC plaintiffs allege three causes of action: (1)

20  breach of contract (Count I), for which plaintiffs seek to recover damages for economic

21  injury and "other damages;" (2) unauthorized telephone charges in violation of California

22  Public Utilities Code § 2890 (Count II), for which for plaintiffs seek to recover both

23  actual and exemplary damages; and (3) claims for unlawful, unfair, and deceptive

24  business practices in violation of California Business and Professions Code § 17200

25  (Count III), for which plaintiffs seek all monies paid to AT&T Mobility LLC as a result

26  of alleged "acts of unfair competition" along with injunctive relief. (*See* Compl. ¶¶ 110,

27  115, & 119.)

28       13. Although AT&T Mobility LLC denies it has any liability to plaintiffs or the

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

SF1\393271\1

1  putative class, and denies that any such class could be properly certified under Federal

2  Rule of Civil Procedure 23,[1] plaintiffs seek to require AT&T Mobility LLC, to pay

3  restitution, as well as compensatory and exemplary damages, as relief to the putative

4  nationwide class, for a period of "years", as plaintiffs allege, of "systematic[] [and]

5  repeated[]" conduct.  (*See* Compl. ¶ 2.)  In addition, plaintiffs seek to require AT&T

6  Mobility LLC to comply with an order of injunction.  All told, plaintiffs seek to recover

7  "economic, monetary, actual, consequential, and compensatory damages" from AT&T

8  Mobility LLC, exemplary damages, costs and attorneys' fees, pre- and post-judgment

9  interest, and injunctive relief.  (*See* Compl., Prayer for Relief ¶¶ d, g, h, & i.)

10      14.    The total amount of an award against AT&T Mobility LLC and favor of

11  plaintiffs and the proposed nationwide class, and consisting of "economic, monetary,

12  actual, consequential, and compensatory damages," exemplary damages, and attorney's

13  fees, would appear be substantial.  In addition, the cost of complying with an award of

14  injunctive relief on the claims alleged in the Complaint against AT&T Mobility LLC

15  would appear to be substantial.  (*See* Compl. ¶ 119; *see id.*, Prayer for Relief ¶ i.)

16      15.    The alleged aggregate amount in controversy with respect to AT&T

17  Mobility LLC alone exceeds $5,000,000.  *See* 28 U.S.C. § 1332 (d)(6) ("In any class

18  action, the claims of the individual class members shall be aggregated to determine

19  whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of

20  interest and costs.").

21      16.    Plaintiffs also allege three causes of action against defendants VeriSign,

22  Inc., m-Qube, Inc., mBlox, Inc., and Mobile Messenger Americas, Inc: (1) claims for

23  unlawful, unfair, and deceptive business practices in violation of California Business and

24  Professions Code § 17200 (Count III), for which plaintiffs seek all monies paid to these

25  defendants as a result of alleged "acts of unfair competition" and injunctive relief; (2)

26

27      [1]    By removing an action under CAFA, Defendants do not concede that they have any
liability, let alone liability greater than $5,000,000, to plaintiffs and the members of the putative class.

28  *See, e.g., Key v. DSW, Inc.*, No. 06-0459, 2006 WL 279430, at *7 (S.D. Ohio Sept. 27, 2006).

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

NOTICE OF REMOVAL

1   restitution/unjust enrichment (Count IV), for which plaintiffs seek a return of the monies

2   "unjustly received" by these defendants "as a result of their actions"; and (3) tortious

3   interference with contract (Count V), for which plaintiffs allege that the putative class

4   suffered a "direct loss." (Compl. ¶¶ 119, 124, & 129.)

5       17.    Although VeriSign, Inc., m-Qube, Inc. and mBlox, Inc. deny that they have

6   any liability to plaintiffs or the putative class, and deny that any such class could be

7   properly certified under Federal Rule of Civil Procedure 23, plaintiffs seek to require

8   Verisign, m-Qube, Inc., and mBlox, Inc., and each of them, to pay actual damages, plus

9   compensatory and exemplary damages as relief to the putative nationwide class, for a

10  period of "years", as plaintiffs allege, of "systematic[] [and] repeated[]" conduct (Compl.

11  ¶ 2.), as well as attorneys' fees. In addition, plaintiffs seek to require VeriSign, Inc., m-

12  Qube, Inc., and mBlox, Inc., and each of them, to comply with an order of injunction.

13  All told, plaintiffs seek to recover "economic, monetary, actual, consequential, and

14  compensatory damages" from VeriSign, Inc., m-Qube, Inc., and mBlox, Inc., and each of

15  them, along with reasonable costs and attorneys' fees and injunctive relief. (*See* Compl.,

16  Prayer for Relief ¶¶ d, g, h, & i.)

17      18.    The total amount of an award against defendants Verisign, Inc., m-Qube,

18  Inc., and mBlox, Inc., and each of them, and in favor of plaintiffs and the proposed

19  nationwide class of "economic, monetary, actual, consequential, and compensatory

20  damages," exemplary damages, and attorney's fees would appear to be substantial.

21  Plaintiffs themselves allege in their heading on page 18 of the Complaint that "VeriSign,

22  m-Qube, Mobile Messenger, and mBlox Have Caused Millions of Dollars In

23  Unauthorized Third Party Mobile Content Charges To Be Billed and Collected."

24  (Compl. at 18.) In addition, the cost of complying with an award of injunctive relief on

25  the claims alleged in the Complaint against Verisign, Inc., m-Qube, Inc., and mBlox, Inc.

26  would appear to be substantial. (Compl. ¶ 119.)

27      19.    Accordingly, the alleged aggregate amount in controversy with respect to

28  either VeriSign, Inc., or m-Qube, Inc., or mBlox, alone exceeds $5,000,000. *See* 28

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

SF1\393271\1    NOTICE OF REMOVAL

1   U.S.C. § 1332 (d)(6) ("In any class action, the claims of the individual class members

2   shall be aggregated to determine whether the matter in controversy exceeds the sum or

3   value of $5,000,000, exclusive of interest and costs.").

4        20.    Furthermore, if each of the individual defendants' alleged aggregate

5   amounts in controversy are taken together in the aggregate, the total exceeds the sum or

6   value of $5,000,000. *See, e.g., Kearns v. Ford Motor Co.*, No. CV 05-5644, 2005 U.S.

7   Dist. LEXIS 41614, at *19 (C.D. Cal. Nov. 21, 2005) (finding that aggregation under

8   CAFA "run[s] across all defendants").

9   ### III.    PROCEDURAL STATEMENT

10       21.    Pursuant to 28 U.S.C. § 1446(a), Defendants have attached as Exhibit A

11  copies of all pleadings, process and orders in the state court action.

12       22.    Because defendants AT&T Mobility LLC, VeriSign, Inc., m-Qube, Inc.,

13  and mBlox, Inc. were served with summons and the Complaint on December 3, 2007,

14  this Notice of Removal has been timely filed with thirty (30) days of service pursuant to

15  28 U.S.C. § 1446(b).

16       23.    Pursuant to 28 U.S.C. § 1441(a), removal to the United States District

17  Court for the Northern District of California is proper because this District embraces the

18  Superior Court of California, San Francisco County, where this action is currently

19  pending. *See* 28 U.S.C. §§ 84(a) & 1441.

20       24.    Pursuant to 28 U.S.C. § 1446(a), Defendants will promptly file a copy of

21  this Notice of Removal with the Superior Court of California, San Francisco County.

22  Likewise, Defendants will promptly serve plaintiffs' attorneys of record with this Notice

23  of Removal and the Notice of Filing.

24       25.    By removing this action to this Court, Defendants do not waive any

25  defenses, objections or motions available to it under state or federal law.  Defendants

26  expressly reserve the right to require that the claims of plaintiffs and all members of the

27  putative class be decided on an individual basis through arbitration.

28       WHEREFORE, pursuant to 28 U.S.C. §§ 1441, 1446, and 1453, Defendants

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

1    respectfully removes to federal court the above-captioned civil action, which is currently

2    pending in the Superior Court of California, San Francisco County.

3

4    Dated: January 2, 2008                          DRINKER BIDDLE & REATH LLP

5

6                                                    MICHAEL J. STORTZ

7                                                    Attorneys for Defendant
                                                     AT&T MOBILITY LLC
8

9    *Of Counsel*
     Seamus C. Duffy
10   DRINKER BIDDLE & REATH LLP
     One Logan Square
     18th & Cherry Streets
11   Philadelphia, Pennsylvania 19103-6996
     Telephone: (215) 988-2700
12

13   Dated: January 2, 2008                          ARNOLD & PORTER LLP

14

15                                                   RONALD L. JOHNSTON
                                                     ANGEL L. TANG
16

17                                                   Attorneys for Defendants
                                                     VeriSign, Inc. and m-Qube, Inc.
18

19   *Of Counsel*
     James Cooper
20   ARNOLD & PORTER LLP
     555 Twelfth Street, NW
21   Washington, DC 20004-1206
     Telephone: (202) 942-5014
22

23   Dated: January 2, 2008                          LUCE FORWARD HAMILTON & SCRIPPS LLP

24

25                                                   JEFFREY A FILLERUP

26                                                   Attorneys for Defendant
                                                     mBlox, Inc.
27

28

DRINKER BIDDLE & REATH LLP
50 FREMONT STREET
20th FLOOR
SAN FRANCISCO, CA 94105-2235

SF1\393271\1

8
NOTICE OF REMOVAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Of Counsel*
Craig M. White
Brent Austin
Chung-Han Lee
WILDMAN HARROLD ALLEN & DIXON LLP
225 West Wacker Drive
28th Floor
Chicago, IL 60606-1229
Telephone:  (312) 201-2000

DRINKER BIDDLE & REATH  LLP
50 FREMONT STREET
20TH FLOOR
SAN FRANCISCO, CA 94105-2235

NOTICE OF REMOVAL

SF1\393271\1

EXHIBIT

A

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

| | FOR COURT USE ONLY |
|---|---|
| | (SOLO PARA USO DE LA CORTE) |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AT&T MOBILITY, LLC d/b/a The New AT&T f/k/a CINGULAR
WIRELESS, a Delaware limited liability company

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
LOUIS JIRAN AND DELORES GRESHAM, individually and on behalf
of a class of similarly situated individuals

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* CGC-07- 468268 |

San Francisco County Superior Court
400 McAllister Street
San Francisco, CA 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Terry M. Gordon, Law Offices of Terry M. Gordon,
Three Harbor Drive, Suite 215, Sausalito, CA 94965, (415) 331-3601

| DATE: | OCT 1 6 2007 | GORDON PARK-LI | Clerk, by | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

BY FAX

IMAGED

FILED

OCT 1 7 2007

San Francisco County Superior Court

OCT 1 6 2007

GORDON PARK-LI, Clerk

BY: _____
Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

MAR 1 4 2008 - 9⁰⁰ AM

DEPARTMENT 212

SUMMONS ISSUED

BY FAX

1  TERRY M. GORDON - SBN 75604
   LAW OFFICES OF TERRY M. GORDON
2  Three Harbor Drive, Suite 215
   Sausalito, California 94965
3  Telephone:     (415) 331-3601
   Facsimile:     (415) 331-1225
4

5  JOHN G. JACOBS (*PENDING  PRO HAC VICE*)
   BRYAN G. KOLTON (*PENDING PRO HAC VICE*)
6  THE JACOBS LAW FIRM, CHTD.
   122 South Michigan Avenue
7  Suite 1850
   Chicago, Illinois 60603
8  Telephone: (312) 427-4000
   Facsimile: (312) 427-1850
9

10 JOHN BLIM (*PENDING PRO HAC VICE*)
   JAY EDELSON (*PENDING PRO HAC VICE*)
11 MYLES MCGUIRE (*PENDING PRO HAC VICE*)
   BLIM & EDELSON, LLC
12 53 West Jackson Boulevard
   Suite 1642
13 Chicago, Illinois 60604
   Telephone: (312) 913-9400
14 Facsimile: (312) 913-9401

15 ATTORNEYS FOR PLAINTIFF

16         SUPERIOR COURT OF THE STATE OF CALIFORNIA
17              FOR THE COUNTY OF SAN FRANCISCO

18 LOUIS JIRAN AND DELORES GRESHAM,      )  Case No. CGC-07-468268
   individually and on behalf of a class of  )
19 similarly situated individuals,           )  **COMPLAINT FOR DAMAGES**
                                             )  **AND INJUNCTIVE RELIEF**
20              Plaintiffs,                  )
                                             )
21 v.                                        )
                                             )  DEMAND FOR JURY TRIAL
22 AT&T MOBILITY, LLC d/b/a The New          )
   AT&T f/k/a CINGULAR WIRELESS, a           )
23 Delaware limited liability company,       )  **CLASS ACTION**
   VERISIGN, INC., a Delaware corporation,   )
24 M-QUBE, INC., a Delaware corporation,     )
   MBLOX, INC., a Delaware corporation, and  )
25 MOBILE MESSENGER AMERICAS, INC.,          )
   a Delaware corporation,                   )
26                                           )
              Defendants.                    )
27 _____      )

28
   _____
   COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### CLASS ACTION COMPLAINT

Plaintiffs Louis Jiran ("Jiran") and Delores Gresham ("Gresham"), on behalf of themselves and two classes of similarly situated individuals, bring this class action against AT&T Mobility, LLC d/b/a the new AT&T f/k/a Cingular Wireless ("AT&T"), VeriSign, Inc. ("VeriSign"), m-Qube, Inc. ("m-Qube"), Mobile Messenger Americas, Inc. ("Mobile Messenger") and mBlox, Inc. ("mBlox") (collectively, "Defendants") seeking to stop Defendants' practice of causing cellular telephone customers to be billed for mobile content services ordered not by them, but rather by the customer previously assigned their telephone number, and to obtain redress for all persons injured by their conduct. Plaintiffs, for their class action complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE CASE

1.      In a widespread industry practice little known by those outside the industry, wireless telephone "carriers" such as AT&T routinely "recycle" so-called "dirty" telephone numbers to their customers when they sign up for new cellular telephone service. The numbers are "recycled" in that they were previously owned and/or used by other persons or entities. The numbers are "dirty" in that they are encumbered with pre-existing billing obligations for products and services authorized to be purchased, if at all, by the previous subscriber assigned those telephone numbers.

2.      AT&T's practice of re-issuing "dirty" phone numbers has resulted in unauthorized charges being placed on unsuspecting customers' telephone bills, in an illegal practice known as "cramming." For years, carriers such as AT&T and billing intermediaries known in the industry as "aggregators" such as Defendants VeriSign, m-Qube, mBlox and Mobile Messenger have, on their behalves and on behalf of third-party "mobile content providers," systematically, repeatedly and without authorization, placed charges on

1    customers' monthly cell phone bills for mobile content services and subscriptions (i.e.,

2    ringtones, joke-a-day programs, wallpaper, screensavers, text alerts, etc.) that were never

3    authorized to be purchased by the current owners of the affected phone numbers.

4        3.    As set forth below, AT&T's conduct was and is: (a) in breach of contract and

5    the duty of good faith and fair dealing, (b) in violation of California Public Utilities Code

6    section 2890 and (c) in violation of California Business and Professions Code section

7    17200's consumer fraud provisions. The "aggregator" Defendants' conduct was and is: (a) in

8    violation of California Business and Professions Code section 17200's consumer fraud

9    provisions; (b) unjust enrichment; and (c) tortious interference with a contract.

10        4.    Because of Defendants' wrongful actions, Plaintiffs seek money damages,

11   injunctive and declaratory relief, costs, and reasonable attorneys' fees on behalf of

12   themselves and the class members.

13                              **PARTIES**

14        5.    Plaintiff Louis Jiran is a citizen of Florida.

15        6.    Plaintiff Deloris Gresham is a citizen of Mississippi.

16        7.    Defendant AT&T Mobility, LLC d/b/a the new AT&T Wireless ("AT&T")

17   f/k/a Cingular Wireless is a leading provider of cellular telephone service in the United

18   States. AT&T is a Delaware limited liability company with its headquarters and principal

19   place of business in the State of Georgia. AT&T does business and has offices throughout

20   the United States, including the State of California and this County.

21        8.    Defendant m-Qube, Inc. ("m-Qube"), a self-proclaimed "leading mobile

22   channel enabler," is an "aggregator" and operates a mobile transaction network that

23   processes mobile payments on its behalf and on behalf of carriers, other aggregators and third

24   party mobile content providers. m-Qube is a Delaware corporation with its headquarters and

25   principal place of business in the State of California. m-Qube does business throughout the

26   United States, including the State of California and this County.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

9.     Defendant VeriSign, Inc. ("VeriSign") is an aggregator with a self-proclaimed "market-leading portfolio of managed communications and content offerings" whose operations have become essentially merged with those of its subsidiary m-Qube.   In May 2006, VeriSign acquired m-Qube and has since integrated and operated many of m-Qube's aggregator systems including, but not limited to, those processing communications and/or mobile content charges that are the subject of this suit.   VeriSign is a Delaware corporation with its headquarters and principal place of business in the State of California.   VeriSign does business throughout the United States, including the State of California and this County.

10.     Defendant mBlox, Inc. ("mBlox"), is an aggregator and operates a mobile transaction network that processes mobile payments on its behalf and on behalf of carriers and third party mobile content providers.   mBlox is a Delaware corporation with its headquarters and principal place of business in the State of California.   mBlox does business throughout the United States, including the State of California and this County.

11.     Defendant Mobile Messenger Americas, Inc. ("Mobile Messenger"), the North American subsidiary of an Australian mobile marketing company, is a so-called "secondary aggregator" who provides billing and aggregating services in the United States to a clientele that, on information and belief, consists primarily of foreign mobile content providers that sell mobile content to consumers in the United States.   On information and belief, Mobile Messenger subcontracts with domestic aggregators such as m-Qube to obtain access to m-Qube's existing domestic carrier relationships and technical infrastructure. Mobile Messenger is a Delaware corporation with its headquarters and principal place of business in the State of California.   Mobile Messenger does business throughout the United States, including the State of California and this County.

## JURISDICTION

12.     This Court has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- 4 -

1  statute to other trial courts.

2      13.    This Court has jurisdiction over Defendants pursuant to Code of Civil

3  Procedure section 410.10 because Defendants reside in and/or conduct business in the State

4  of California and/or many of Defendants' wrongful acts arose or emanated from California.

5                                    **VENUE**

6      14.    Venue is proper in this Court pursuant to Code of Civil Procedure §§ 395 and

7  395.5 because at least one of the Defendants, AT&T, has not filed a statement with the

8  California Secretary of State designating a principal office within the State of California.

9    **THE PROBLEM OF RECYCLYING DIRTY CELL PHONE NUMBERS**

10     15.    Cell phone customers are assigned unique phone numbers for their phones,

11  just like traditional land-lines.

12     16.    However, unlike traditional phones, people can use cell phones to pay for

13  certain third-party-provided mobile content services and subscriptions, like, for example,

14  "ring tones," games, horoscopes, text alerts, jokes, and stock quotes sent periodically to

15  customers' cell phones, etc.  (A ringtone is simply the sound made by a telephone to indicate

16  an incoming call. The term is most often used to refer to the customizable sounds available

17  on mobile phones.)

18     17.    These services are generally subscription based and renew automatically each

19  month, and the resulting charges are included on the customer's cell phone bill.

20     18.    The instant lawsuit flows from what happens when a carrier, such as AT&T,

21  reissues (or "recycles") a cellular number previously assigned to a customer who then gave

22  up the number.  (Customers abandon numbers for many different reasons, e.g. they move to

23  a different area code, they change carriers, they no longer want one of their cell phones, or

24  they want a different phone number.)

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- 5 -

19.     Defendants know that these abandoned numbers are often encumbered with preexisting subscriptions to services provided by mobile content providers – thus rendering these numbers "dirty."

20.     Nevertheless none of the Defendants has set up procedures wherein the dirty numbers are "cleansed" of the preexisting subscriptions.  AT&T allows such third-party services to be billed directly on a customer's monthly wireless bill, and it retains a substantial portion of the charges collected thereon, and the aggregators in turn likewise receive a substantial portion of the charges collected and pass the remainder on to the content providers.  Essentially, AT&T joint ventures with the aggregators and content providers in this lucrative and growing business and none has an interest in taking action that would inhibit the substantial profits they realize from this illegal activity.

21.     Thus, when a telephone number is reassigned to a new customer, Defendants continue to charge the new customer for subscriptions purchased by the old customers and none takes action to see to it that they charge customers only for services they have ordered.

### THE FACTS RELATING TO NAMED PLAINTIFF JIRAN

22.     On or about June 20, 2006, Jiran visited the website of an authorized AT&T sales representative to purchase new cell phone service for his family's personal use.

23.     On that same day, in exchange for an AT&T cell phone plan called "FamilyTalk Plan 1400 Minutes with Unlimited Nights and Weekends and Unlimited Mobile to Mobile," Jiran agreed to pay AT&T approximately $80.00 per month for the first cellular telephone line on the plan plus $9.99 for each of the three additional cellular telephone lines on the plan.

24.     Upon purchasing AT&T's cellular telephone services and activation of his cellular telephone account, AT&T provided Jiran a cellular telephone number of "[redacted]-5945."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 6 -

25.     Unbeknownst to Jiran, AT&T provided him with a recycled "dirty" phone number -- one saddled with pre-existing obligations, encumbrances and billing arrangements for products and services.

26.     Thus, beginning on or about June 24, 2006 -- within days of Jiran's obtaining his cell phone number and starting to receive service from AT&T -- and continuing through approximately March 12, 2007, Plaintiff Jiran's cell phone received multiple unwanted "premium" text message calls and/or charges from Mobile Messenger on behalf of its client, Mobile Data Group, Inc. ("Mobile Data Group"), a third-party provider of mobile content. "Premium" text messages are services that result in "premium" charges on one's cell phone bill. "Premium" charges are those charges that result primarily from mobile content services, which are frequently provided by third-party mobile content companies. These charges resulted from subscription(s) made by the prior assignee(s) of the number that was then recycled to Jiran.

27.     Throughout the relevant period, Jiran received dozens of such messages and/or charges.

28.     At no time did Jiran authorize the purchase of these products and services from Mobile Messenger and at no time did Jiran consent to Mobile Messenger's sending of text messages to his cellular telephone.

29.     Beginning on June 24, 2006, and continuing throughout the relevant time period, AT&T billed Jiran a monthly "Premium Text Message" charge of $9.99 for such unauthorized text messages.

30.     Jiran's cell phone bill identified "Mobile Messenger" as the entity that sent the messages and caused the charges to be placed on his bill, but failed to identify the content provider responsible for generating the charge.

31.     At no time did Jiran authorize AT&T or anyone else to bill him for these products or services.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- 7 -

32.     On or about September 25, 2006, in what would become the first of numerous such efforts, Jiran contacted AT&T to inquire why his bills were so high and was told that it was because of premium text message charges from a company called m-Qube, Inc., who, Jiran later learned, was acting on behalf of Mobile Messenger, who was acting on behalf of one of its content provider clients.

33.     Jiran advised AT&T that he did not authorize the purchase of these products and services offered by m-Qube, Mobile Messenger or any other party and that at no time did he consent to being sent any of the text messages referred to herein. Jiran then asked AT&T how he could stop being sent these unauthorized text messages for which he was being billed by AT&T and how he could obtain a full refund. While AT&T agreed at that time to a partial refund of the unauthorized "premium" charges that he had incurred, AT&T failed to issue a full refund for "standard" text message fees, taxes paid and/or interest lost due to AT&T's issuance of a "dirty" "recycled" phone number to him. AT&T further refused to guarantee that it would stop future charges from being placed on the account and that he would instead have to contact either m-Qube or Mobile Messenger to do so.

34.     Thereafter, on or about December 21, 2006 and then again on or about March 12, 2007, Jiran learned that additional unauthorized premium text message charges had appeared on his cell phone bill and each time contacted AT&T. Jiran was told that the charges had been placed on his bill by m-Qube, Inc., who was acting on Mobile Messenger's behalf.

35.     Jiran again advised AT&T that he did not authorize the purchase of these products and services offered by m-Qube, Mobile Messenger or any other party and that at no time did he consent to being sent any of the text messages referred to herein. Jiran again asked AT&T how he could stop being sent these unauthorized text messages for which he was being billed and how he could obtain a full refund. While AT&T agreed at that time to a partial refund of the unauthorized "premium" charges that he had incurred, AT&T failed to

1     issue a full refund for "standard" text message fees, taxes paid and/or interest lost due to

2     AT&T's issuance of a "dirty" "recycled" phone number to him. Each time AT&T informed

3     Jiran that he would have to pay an early termination fee of approximately $175 if he wished

4     to cancel the account.

5          36.     AT&T never undertook to resolve the dispute to Jiran's satisfaction, never

6     sought to confirm whether he had, in fact, provided authorization to purchase products and

7     services offered by m-Qube, Mobile Messenger or any other party, never verified whether he

8     had, in fact, provided consent to m-Qube or Mobile Messenger to send any text message to

9     his telephone number, and never verified that he had, in fact, provided authorization to bill

10     his account for these charges. Rather, AT&T simply "passed the buck," advising Jiran to

11     contact m-Qube and Mobile Messenger.

12          37.     On multiple occasions thereafter, Jiran attempted to contact m-Qube, but was

13     unable to speak directly with anyone at the company who could credit him in full for such

14     unauthorized charges. m-Qube later contacted Jiran via email to confirm that it was billing

15     him on behalf of its client, Mobile Messenger, and to advise him that it had forwarded a

16     request to Mobile Messenger to remove his number from all its services. m-Qube never

17     offered to credit Jiran for the unauthorized charges.

18          38.     Mobile Messenger was then contacted through counsel to obtain further detail

19     regarding the date of Jiran's purported authorization to be sent and charged for the premium

20     text messages referred to herein.

21          39.     According to Mobile Messenger, the purported authorization was obtained by

22     Mobile Messenger's client Mobile Data Group from an unidentified person identified with

23     the same phone number eventually assigned by AT&T to Jiran. However, the authorization

24     for the subject charges was obtained in **2005** – a date at least *more than six months prior* to

25     the time that Jiran first purchased cell phone service from AT&T, obtained that same cell

26     phone number from AT&T, or started receiving AT&T service.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

40.     Jiran could not possibly have authorized the charges for which he was being billed, as he was not in possession of the phone number in question nor did he have authority to bill such phone number.

### THE FACTS RELATING TO NAMED PLAINTIFF GRESHAM

41.     On or about April 1, 2006, Gresham called an authorized AT&T sales representative to purchase new cell phone service for her family's personal use.

42.     On that same day, in exchange for a AT&T cell phone plan called "FamilyTalk Nation 550 Rollover & Unlimited Night/Weekend & Unlimited Mobile-To-Mobile Minutes," Gresham agreed to pay AT&T approximately $50.00 per month for the first cellular telephone line on the plan plus an additional amount for the additional cellular telephone line on the plan.

43.     Upon purchasing AT&T's cellular telephone services and activation of her cellular telephone account, AT&T provided Gresham a cellular telephone number of "[redacted]-5164."

44.     Unbeknownst to Gresham, AT&T provided her with a recycled "dirty" phone number -- one saddled with pre-existing obligations, encumbrances and billing arrangements for products and services.

45.     Thus, beginning on or about April 19, 2006 -- within days of Gresham's obtaining her cell phone number and starting to receive service from AT&T -- and continuing through approximately May 26, 2006, Gresham's cell phone received multiple unwanted mobile content services and/or charges from mBlox on behalf of its client 9 Squared, Inc. ("9 Squared"), a third-party provider of mobile content.

46.     Throughout the relevant period, Gresham received several such services and/or charges.

47.     At no time did Gresham authorize the purchase of these products and services offered by mBlox or its customers and at no time did she consent to mBlox's sending of mobile content to her cellular telephone.

48.     Beginning on April 19, 2006, and continuing throughout the relevant time period, AT&T repeatedly billed Gresham a charge of $9.99 for such unauthorized services.

49.     Gresham's cell phone bill identified "mBlox" as the entity that sent the mobile content and caused the charges to be placed on her bill, but failed to identify the content provider responsible for generating the charge.

50.     At no time did Gresham authorize AT&T or anyone else to bill her for these charges.

51.     On or about August 15, 2007, in what would become the first of numerous such efforts, Gresham contacted AT&T to inquire why her bills were so high and was told that it was because of mobile content charges from a company called mBlox, who, she was told by AT&T, was acting on behalf of a second company, mobile content provider Squared 9.

52.     Gresham advised AT&T that she did not authorize the purchase of these products and services offered by mBlox and that at no time did she consent to being sent any of the mobile content services referred to herein.  AT&T failed to issue a full refund for the "premium" mobile content charges incurred, "standard" text message charges, taxes paid and interest lost due to AT&T's issuance of a "dirty" "recycled" phone number to Gresham.

53.     AT&T never undertook to resolve the dispute to Gresham's satisfaction, never verified that she had, in fact, provided authorization to purchase products and services offered by mBlox and/or Squared 9, never verified whether she had, in fact, provided consent to mBlox and/or Squared 9 to send mobile content to her telephone number, and never verified that she had, in fact, provided authorization to bill her account for said charges. Rather, AT&T simply "passed the buck," advising Gresham to contact mBlox and Squared 9.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 11 -

54.    Squared 9 was then contacted through counsel to obtain further detail regarding the date of Gresham's purported authorization to be sent and charged for the mobile content referred to herein.

55.    According to Squared 9, the purported authorization to be sent and charged for such mobile content was obtained by mBlox's client Squared 9 from an unidentified person identified with the same phone number eventually assigned by AT&T to Gresham. However, the authorization for the subject charges was obtained in **September 2005** – a date at least *more than six months prior* to the time that Gresham first purchased cell phone service from AT&T, obtained that same cell phone number from AT&T, or started receiving AT&T service.

56.    Gresham could not possibly have authorized the charges for which she was being billed, as she was not in possession of the phone number in question nor did she have authority to bill such phone number.

## ADDITIONAL ALLEGATIONS APPLICABLE TO AT&T

57.    AT&T is a telephone corporation and public utility as defined in California Pub. Util. Code sections 216 and 234 and is certified by the California Public Utilities Commission ("CPUC") to offer, and does in fact offer and sell, mobile cellular telecommunication services throughout the State of California.

58.    AT&T uses uniform form contracts under which customers purchase cell phone services.

59.    AT&T's services include providing access to and billing for various third-party services such as ring tones, joke-a-day programs, wallpaper, screensavers and other forms of software provided by numerous third-party vendors, including those mentioned in this complaint.

1    60.    AT&T has contracted with third-party providers, for a fee, to bill and collect

2  from AT&T's customers for third party services that are included directly on a customer's

3  monthly wireless bill.

4    61.    Envisioning the potential for abuse, the California Legislature adopted

5  California Public Utilities Code section 2890 which provides, in relevant part, that: "(a) A

6  telephone bill may only contain charges for products or services, the purchase of which the

7  subscriber has authorized."

8    62.    Public Utilities Code section 2890 was intended to deter the unlawful practice

9  of "cramming," *i.e.*, the placing of unauthorized charges on telephone bills, as defined in the

10  Legislative History of Public Utilities Code sections 2889.9 and 2890:

11          ["This bill addresses the problem of 'cramming,' a practice in
            which consumers are charged for unauthorized services in their
12          phone bills. [¶] ... [¶] A relatively new, and growing, scam on
            telephone customers is the imposition of charges on the
13          telephone bill for products or services the customer has not
            bought.... [¶] Often the charges which are 'crammed' on the
14          customer's bill are relatively small, less than $10, and
            inconspicuously labeled. If one does not carefully scrutinize
15          the telephone bill, the crammed charge could easily be
            overlooked."]; Sen. Bill No. 378, approved by Governor, Sept.
16          30, 1998 (Amend.Aug.21, 1998) (1997 1998 Reg. Sess.) ["
            'Cramming' charges are usually comprised of services such as
17          unauthorized voice mail options, Internet access options,
            calling cards, paging services, and 800 numbers. In many
18          cases[,] these unauthorized charges are initiated from
            sweepstakes, raffles, and telemarketers of unknown and
19          unscrupulous companies."].)

20  Assem. Bill No. 2142, 3d reading May 7, 1998, Assem. Floor (1997 1998 Reg. Sess.).

21    63.    According to the CPUC, "the practice of cramming has become a serious and

22  widespread problem in California, draining time and money from California consumers and

23  businesses."

24    64.    Revised General Order 168, "Market Rules to Empower Telecommunications

25  Consumers and to Prevent Fraud" similarly provides that "Telephone companies may bill

26  subscribers only for authorized charges."

27

28
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
- 13 -

65.     Further, the duty of good faith and fair dealing, a part of every contract, requires that AT&T not bill any customer for any good or service not authorized by the customer.

66.     Upon execution of service contracts and activation of cellular telephone accounts, AT&T provides its customers a ten-digit cellular telephone number.

67.     As explained above, unbeknownst to its customers, AT&T often "recycles" "dirty" telephone numbers, numbers that were previously owned and/or used by other persons or entities and encumbered with pre-existing billing obligations for products and services authorized to be purchased.

68.     AT&T systems routinely provide customers with ten-digit cellular phone numbers that have not been properly "screened" and scrubbed "clean" so as to ensure that its customers are not adversely affected by the actions, inactions, obligations and/or encumbrances of previous owners and/or users of the telephone numbers.

69.     As a result, AT&T has for years been systematically, repeatedly and without authorization, billing its customers for products and services not authorized to be purchased by those customers. Indeed, if such purchases were authorized, they were authorized by previous owners and/or users of such telephone numbers. AT&T, aggregators and third-party service providers have, on information and belief, profited greatly from this practice.

70.     AT&T's unlawful charging is further exacerbated by its failure to comply strictly with various disclosure-related requirements of Public Utilities Code section 2890, making it more difficult for customers to discover the unauthorized charges, realize what their options are, and thereafter dispute said charges.

71.     Public Utilities Code section 2890(d) provides, in relevant part, as follows:

> (d) (1) A billing telephone company shall clearly identify, and use a separate billing section for, each person, corporation, or billing agent that generates a charge on a subscriber's telephone bill. A billing telephone company may not bill for a person, corporation, or billing agent, unless that person, corporation or billing agent complies with paragraph (2).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- 14 -

(2) Any person, corporation, or billing agent that charges subscribers for products or services on a telephone bill shall do all of the following:

(A) Include, or cause to be included, in the telephone bill the amount being charged for each product or service, including any taxes or surcharges, and a clear and concise description of the service, product, or other offering for which a charge has been imposed.

(B) Include, or cause to be included, for each entity that charges for a product or service, information with regard to how to resolve any dispute about that charge, including the name of the party responsible for generating the charge and a toll free telephone number or other no cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. Each telephone bill shall include the appropriate telephone number of the commission that a subscriber may use to register a complaint.

72. Although required to do so, the bills issued by AT&T systematically failed to include information with regard to how to dispute specific charges, failed to include the name of the party responsible for generating the charge, failed to include a toll-free telephone number or other no-cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. AT&T's bills also systematically failed to "include the appropriate telephone number of the commission that a subscriber may use to register a complaint," as required by section 2890(d) (2) (b).

73. According to the CPUC, "[t]he obvious purpose of including the Commission's contact information is to safeguard consumers' Rights to Public Participation and Enforcement (consumers have a right to be informed of their rights and what agency enforces those rights) and Accurate Bills and Redress (consumers have a right to fair, prompt and courteous redress for problems they encounter). Without this information, many or most consumers won't realize what their options are."

74. Public Utilities Code section 2890(e) further requires that "[i]f an entity responsible for generating a charge on a telephone bill receives a complaint from a subscriber

that the subscriber did not authorize the purchase of the product or service associated with that charge, the entity, not later than 30 days from the date on which the complaint is received, shall verify the subscriber's authorization of that charge or undertake to resolve the billing dispute to the subscriber's satisfaction." AT&T systematically failed to adhere to these "cramming" rules in its treatment of Plaintiffs and other affected customers.

75.     Pursuant to Public Utilities Code section 2890(d)(2)(D), "[i]f there is a dispute, there is a rebuttable presumption that an unverified charge for a product or service was not authorized by the subscriber and that the subscriber is not responsible for that charge." Plaintiffs and the Class dispute said charges and, thus, are entitled to a presumption that the charges were unauthorized.

76.     AT&T's conduct is by no means accidental. As hereinbefore alleged, AT&T knows that the cell phone numbers it issues include numbers previously assigned to former customers; knows that these previously-used numbers often are encumbered with pre-existing subscriptions, and knows, from receipt of customer complaints about billings for pre-existing subscriptions, that among the numbers it issues are numbers with pre-existing subscriptions.

77.     Despite this knowledge AT&T has not set up procedures to insure that the numbers it assigns to new customers have been cleansed of pre-existing and undisclosed subscriptions.  In light of its knowledge of these facts, AT&T's decision to continue issuing phone numbers without taking any steps to cleanse them constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.  Because the amount AT&T is taking is small on an individual basis and because of AT&T's vast resources and superior bargaining power, AT&T employs this scheme with the hope and expectation that its illegal conduct will go unpunished.

## ADDITIONAL ALLEGATIONS APPLICABLE
## TO VERISIGN, M-QUBE, MOBILE MESSENGER AND MBLOX

78.     As aggregators, VeriSign, m-Qube, Mobile Messenger and mBlox operate mobile transaction networks helping companies develop, deliver, and bill for mobile content services such as ringtones, wallpapers, games, graphics, horoscopes, data, news, and information transmitted or received via chat services (collectively, "content") to compatible mobile devices throughout the State of California and the nation.

79.     Through VeriSign's, m-Qube's and mBlox's services, their end-to-end technology platforms, U.S. carrier relationships and other value-added services, they have become a one-stop shop for carriers such as AT&T, other "secondary" aggregators such as Mobile Messenger, and third-party mobile content providers such as Mobile Data Group and Squared 9, empowering them to take advantage of wireless as a content delivery, marketing and communications channel, while carving out a role for themselves as very critical middlemen in this rapidly growing industry.

80.     In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks and frequently do so by "partnering" with aggregators such as m-Qube, mBlox and VeriSign that provide their content providers clients direct access to the carriers through existing relationships.

81.     m-Qube, mBlox and Verisign have developed vast distribution systems that integrate into the wireless networks of some of the largest wireless carriers nationwide, providing direct connections to more than 500 mobile operators, including AT&T, Verizon, Sprint Nextel, T-Mobile, Alltel, US Cellular, among many others.

82.     Prior to its May 2006 purchase of m-Qube, VeriSign operated its own aggregator systems including, but not limited to, those processing communications and/or charges associated with recycled telephone numbers. Since its May 2006 purchase of m-Qube, VeriSign has integrated and operated many of m-Qube's aggregator systems

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    including, but not limited to, those processing communications and/or charges associated

2    with recycled telephone numbers.

3        83.    As the North American subsidiary of an Australian mobile marketing

4    company, Mobile Messenger provides aggregating services in the United States to a clientele

5    that, on information and belief, consists primarily of foreign mobile content providers

6    seeking to sell mobile content to consumers in the United States.  In order to provide such

7    services, Mobile Messenger subcontracts with domestic aggregators in the U.S. such as m-

8    Qube to access the latter's existing carrier relationships and technical infrastructure to

9    conduct mobile marketing campaigns on behalf of its overseas clients.

**VeriSign, m-Qube, Mobile Messenger and mBlox Have Caused Millions Of Dollars In Unauthorized Third Party Mobile Content Charges To Be Billed and Collected**

12       84.    While aggregators such as VeriSign, m-Qube, Mobile Messenger and mBlox

13   charge their content provider customers some upfront fees, their revenue is primarily

14   generated through a "revenue share" on transactions for which they bill cell phone

15   subscribers: each time a charge is incurred in connection with mobile content services

16   offered by a content provider, the aggregator and/or the content provider cause the charge to

17   be billed directly on the cellular telephone bill of the carrier's customer currently assigned

18   the telephone number associated with the charge.

19       85.    The carrier then bills and collects the charge from the subscriber, retains a

20   substantial portion of the proceeds as its "revenue share" and then remits the balance to the

21   aggregator who has direct access to its network, who in turn retains a percentage of the

22   balance in the form of its own "revenue share" and in turn then remits the remainder directly

23   to the mobile content provider, or as the case may be, to another aggregator, e.g. Mobile

24   Messenger, who then retains a percentage of the balance in the form of its own "revenue

25   share" and then remits the balance to its mobile content provider client, e.g. Mobile Data

26   Group.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

86.     VeriSign, m-Qube, Mobile Messenger and mBlox have registered thousands of transactions and processed many thousands of dollars in transactions over the years and have profited enormously from their arrangement with their carrier partners, aggregator partners and content provider partners.

87.     The vast majority of the conduct that led to the billing and collecting of unauthorized cell phone charges either occurred in California or was directed from here. The principal offices of all four aggregator Defendants are located in California. The act of processing unauthorized charges to consumers' cell phone bills frequently begins in California or is under the control of persons located within California. Many of the systems employed by the aggregator Defendants were distributed, developed and/or manufactured by persons located in California. Calls from subscribers nationwide to each aggregator Defendant route to a California location and subscribers are directed by the carriers to correspond with a Defendant at a California location. Press releases by the aggregator Defendants frequently disseminate from California. Business decisions for each aggregator Defendant are made in California. As the actions of the aggregator Defendants that lead to the unauthorized charges originate and/or are directed from locations in California, so too does AT&T's activity originate in California since the act, omission, or failure of any agent is the act, omission, or failure of its principal.

88.     As VeriSign, m-Qube, Mobile Messenger and mBlox know, carriers such as AT&T routinely "recycle" so-called "dirty" telephone numbers to their customers when they sign up for new cellular telephone service.

89.     VeriSign, m-Qube, Mobile Messenger and mBlox have not only sanctioned this illegal billing, they have actively and knowingly promoted it and profited from it by, *inter alia*, actively negotiating and facilitating partnerships between and amongst each other and/or other carriers, aggregators and content providers wherein (1) the content providers and aggregators do not adequately verify whether a telephone number has been recycled or

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 19 -

reassigned; (2) the carriers do not adequately verify the details of the purported authorization to place charges on a cell phone customer's bill, including the identity of the person who supposedly consented to the service, the date such consent was obtained or the manner in which it was obtained; and/or (3) charges are illegally inserted into customers' billing statements for subscriptions for subscriptions and mobile content services not authorized by the persons assigned these recycled numbers, but rather by the subscriber previously assigned the number.

90.    Indeed, if Defendants wanted to end this illegal billing, they could do so in an instant. All they would have to do is ensure that the carriers and content providers report to each other and to the aggregators (1) the identity of the person who subscribed to the services in question, along with the date of that subscription, and (2) the identity of the current owner of the phone number in question, along with the date he or she obtained that number. If the identities do not match or the dates are inconsistent (i.e. the carrier's records show that the consent date came prior to the date the current owner obtained his or her number), no charges would be included on the customer's billing statement.

91.    Instead Defendants have intentionally created and maintained a system wherein each participant has a piece of the information and thus can, at least, claim (false as it is) that the blame rests at the feet of another. Such system constitutes a deliberate and wilful scheme to cheat large numbers of people out of small amounts of money.

92.    As a direct result, Defendants have profited enormously from this illegal practice, all the while maintaining a system designed to allow them to maintain plausible deniability.

## CLASS ALLEGATIONS

93.    Plaintiffs bring this action, pursuant to Code of Civil Procedure § 382 on behalf of themselves and two classes. Those classes are defined as follows:

A.    The "AT&T Class:": a class consisting of all AT&T wireless telephone subscribers in the nation who were charged by AT&T for mobile content services where the date of authorization for such charges preceded the date that the telephone number was assigned by AT&T to such subscriber; provided, however, that the following are excluded from this proposed Class: (i) the defendants, and (ii) any employee of a defendant.

B.    The "Aggregator Class:" a class consisting of all wireless telephone subscribers in the nation who were charged by VeriSign, m-Qube, Mobile Messenger and/or mBlox for mobile content services where the date of authorization for such charges preceded the date that the telephone number was assigned to such subscriber by his or her wireless carrier; provided, however, that the following are excluded from this proposed Class: (i) the defendants, and (ii) any employee of a defendant.

94.    The Classes (hereafter, "the Classes") each consists of thousands of individuals and other entities, making joinder impractical, in satisfaction of Code of Civil Procedure § 382.

95.    The claims of Plaintiffs are typical of the claims of all of the other members of the respective Classes.

96.    Plaintiffs will fairly and adequately represent and protect the interests of the other members of the respective classes.  Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

97.    Absent a class action, most members of the Classes would find the cost of litigating their claims to be prohibitive, and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 21 -

1  or piecemeal litigation in that it conserves the resources of the courts and the litigants, and

2  promotes consistency and efficiency of adjudication.

3      98.    Defendants have acted and failed to act on grounds generally applicable to the

4  Plaintiffs and the other members of the respective Classes, requiring the Court's imposition

5  of uniform relief to ensure compatible standards of conduct toward the members of the

6  Classes.

7      99.    The factual and legal bases of Defendants' liability to Plaintiffs and to the

8  other members of the respective Classes are the same, resulting in injury to the Plaintiffs and

9  to all of the other members of the Classes. Plaintiffs and the other Class members have all

10  suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

11      100.    There are many questions of law and fact common to the claims of Plaintiffs

12  and the other members of the respective Classes, and those questions predominate over any

13  questions that may affect individual members of the Classes. Common questions for the

14  AT&T Class include but are not limited to the following:

15      (a)    Whether AT&T's conduct described herein is in breach of contract.

16      (b)    Whether AT&T's conduct described herein is in violation of

17  California's Public Utility Code section 2890.

18      (c)    Whether AT&T's conduct described herein violates California

19  Business and Professions Code sections 17200, *et seq.*

20    101.    Common questions for the Aggregator Class include:

21      (a)    Whether VeriSign, m-Qube, Mobile Messenger and/or mBlox have

22  unjustly received money belonging to Plaintiffs and the Aggregator Class and

23  whether under principles of equity and good conscience, m-Qube, Mobile Messenger

24  and/or VeriSign should not be permitted to retain it;

25      (b)    Whether VeriSign, m-Qube, Mobile Messenger and/or mBlox

26  tortiously interfered with Plaintiffs' and the Aggregator Class's contracts with their

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1     wireless carriers by causing them to be charged for products and services by their

2     carrier that were authorized, if at all, by the previous owner and/or user of their

3     telephone number.

4           (c)      Whether VeriSign's, m-Qube's, Mobile Messenger's and/or mBlox's

5     conduct described herein violates California Business and Professions Code sections

6     17200, *et seq.*

7

## COUNT I

## (Breach Of Contract on behalf of the AT&T Class)

9       102.    Plaintiffs incorporate by reference the foregoing allegations.

10      103.    Plaintiffs and the AT&T Class entered into an agreement with Defendant

11     AT&T whereby Plaintiffs and the AT&T Class agreed to pay a certain sum of money in

12     exchange for AT&T's activation of Plaintiffs' and the AT&T Class's cellular telephone

13     account and its promise to provide various communication and related services to Plaintiffs

14     and the AT&T Class.

15      104.    Defendant AT&T expressly and/or impliedly agreed to provide Plaintiffs and

16     the AT&T Class with a cellular telephone number free of preexisting billing obligations for

17     products and services ordered, purchased and/or authorized by the previous owners and/or

18     users of said telephone numbers.

19      105.    Defendant AT&T further expressly and/or impliedly agreed to bill Plaintiffs

20     and the AT&T Class only for products or services the purchase of which they had authorized.

21      106.    Defendant AT&T further expressly and/or impliedly agreed to carry out its

22     obligations in good faith and fair dealing.

23      107.    Defendant AT&T breached its contractual obligations by providing Plaintiffs

24     and the AT&T Class with a phone number saddled with preexisting obligations,

25     encumbrances and billing arrangements for products and services ordered, purchased and/or

26     authorized, if at all, by the previous owners and/or users of said telephone numbers.

27

28

1   108. Defendant AT&T further breached its contractual obligations, including its

2 contractual obligation of good faith and fair dealing, by thereafter billing Plaintiffs and the

3 AT&T Class for products or services, the purchase of which they never authorized.

4   109. Plaintiffs and the AT&T Class have performed their obligations under the

5 contract.

6   110. The aforementioned breaches of contract have proximately caused the

7 Plaintiffs and the AT&T Class economic injury and other damages

8

9          **COUNT II**

10    **(Unauthorized Telephone Charges In Violation Of**
    **California Public Utilities Code § 2890 on behalf of the AT&T Class)**

11   111. Plaintiffs incorporate by reference the foregoing allegations.

12   112. California Public Utilities Code section 2106 provides aggrieved persons the

13 following private right of action:

14     Any public utility which does, causes to be done, or permits
     any act, matter, or thing prohibited or declared unlawful, or
15     which omits to do any act, matter, or thing required to be done,
     either by the Constitution, any law of this State, or any order or
16     decision of the commission, shall be liable to the persons or
     corporations affected thereby for all loss, damages, or injury
17     caused thereby or resulting therefrom.  If the court finds that
     the act or omission was willful, it may, in addition to the actual
18     damages, award exemplary damages.  An action to recover for
     such loss, damage, or injury maybe brought in any court of
19     competent jurisdiction by any corporation or person.

20   113. In an effort to deter the unlawful practice of "cramming," *i.e.*, the placing of

21 unauthorized charges on telephone bills, the California legislature enacted Public Utilities

22 Code section 2890, which provides, in pertinent part, as follows:

23     (a) A telephone bill may only contain charges for
    products or services, the purchase of which the subscriber has
24    authorized.

25     (b) When a person or corporation obtains a written
    order for a product or service, the written order shall be a
26    separate document from any solicitation material.  The sole
    purpose of the document is to explain the nature and extent of
27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
         - 24 -

the transaction. Written orders and written solicitation materials shall be unambiguous, legible, and in a minimum 10 point type. Written or oral solicitation materials used to obtain an order for a product or service shall be in the same language as the written order. Written orders may not be used as entry forms for sweepstakes, contests, or any other program that offers prizes or gifts.

(d) (1) A billing telephone company shall clearly identify, and use a separate billing section for, each person, corporation, or billing agent that generates a charge on a subscriber's telephone bill. A billing telephone company may not bill for a person, corporation, or billing agent, unless that person, corporation or billing agent complies with paragraph (2).

(2) Any person, corporation, or billing agent that charges subscribers for products or services on a telephone bill shall do all of the following:

(A) Include, or cause to be included, in the telephone bill the amount being charged for each product or service, including any taxes or surcharges, and a clear and concise description of the service, product, or other offering for which a charge has been imposed.

(B) Include, or cause to be included, for each entity that charges for a product or service, information with regard to how to resolve any dispute about that charge, including the name of the party responsible for generating the charge and a toll free telephone number or other no cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. Each telephone bill shall include the appropriate telephone number of the commission that a subscriber may use to register a complaint.

(C) Establish, maintain, and staff a toll free telephone number to respond to questions or disputes about its charges and to provide the appropriate addresses to which written questions or complaints may be sent. The person, corporation, or billing agent that generates a charge may also contract with a third-party, including, but not limited to, the billing telephone corporation, to provide that service on behalf of the person, corporation or billing agent.

(D) Provide a means for expeditiously resolving subscriber disputes over charges for a product or service, the purchase of which was not authorized by the subscriber. In the case of a dispute, there is a rebuttable presumption that an unverified charge for a product or service was not authorized by the subscriber and that the subscriber is not responsible for that charge. With regard to direct dialed telecommunications services, evidence that a call was dialed is prima facie evidence of authorization. If recurring charges arise from the use of those subscriber initiated services, the recurring charges are subject to this section.

(E) If an entity responsible for generating a charge on a telephone bill receives a complaint from a subscriber that the subscriber did not authorize the purchase of the product or service associated with that charge, the entity, not later than 30 days from the date on which the complaint is received, shall verify the subscriber's authorization of that charge or undertake to resolve the billing dispute to the subscriber's satisfaction.

114.   Defendant AT&T violated section 2890 by virtue of its conduct alleged above, including its billing for products or services, the purchase of which Plaintiffs never authorized, thereby causing Plaintiffs and the members of the class to suffer loss, damage, and injury.

115.   Plaintiffs and the Sub-Class are entitled to actual damages pursuant to Public Utilities Code section 2106. Plaintiffs and the Sub-Class are further entitled to exemplary damages to the extent the evidence shows that Defendant's violations were willful.

## COUNT III

**(Unlawful, Unfair and Deceptive Business Practices in Violation of California Business & Professions Code § 17200, et seq. on behalf of all Classes)**

116.   Plaintiffs incorporate by reference the foregoing allegations.

117.   The Unfair Business Practices Act proscribes unfair business competition and defines same to include any "unfair," "unlawful," or "fraudulent" business act or practice. California Business & Professions Code §17200 *et seq.*

118. Defendants violated, and continue to violate this proscription through their conduct alleged above, including their violations of the California Public Utilities Code section 2890, as set forth above.

119. Defendants, through their acts of unfair competition, have obtained money from Plaintiffs and members of the proposed Classes. Plaintiffs and the members of the Classes ask that this Court restore this money to them and enjoin Defendants from continuing their illegal practices.

120. Such conduct is ongoing and continues to this date. Plaintiffs, the Class members and the general public are therefore entitled to the relief described herein.

## COUNT IV
### (Restitution/Unjust Enrichment on behalf of the Aggregator Class)

121. Plaintiffs incorporate by reference the foregoing allegations.

122. A benefit has been conferred upon VeriSign, m-Qube, Mobile Messenger and mBlox by Plaintiffs and the Aggregator Class. VeriSign, m-Qube, Mobile Messenger and mBlox have received and retain money belonging to Plaintiffs and the Aggregator Class resulting from their billing and collecting vast sums in unauthorized third party mobile content charges, and in particular, their practice of systematically, repeatedly and without authorization, causing Plaintiffs and/or the Aggregator Class of cellular telephone customers to be billed by their cellular carriers for mobile content services authorized by prior owners/users of the number assigned to class member.

123. VeriSign, m-Qube, Mobile Messenger and mBlox appreciate or have knowledge of said benefit.

124. Under principles of equity and good conscience, VeriSign, m-Qube, Mobile Messenger and mBlox should not be permitted to retain the money belonging to Plaintiffs and the Aggregator Class which VeriSign, m-Qube, Mobile Messenger and mBlox have unjustly received as a result of their actions.

## COUNT V

### (Tortious Interference with a Contract on behalf of the Aggregator Class)

125.    Plaintiffs incorporate by reference the foregoing allegations.

126.    Plaintiffs and the Aggregator Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiffs and the Aggregator Class and to bill Plaintiffs and the Aggregator Class only for products or services the purchase of which they had authorized.

127.    VeriSign, m-Qube, Mobile Messenger and mBlox knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

128.    VeriSign, m-Qube, Mobile Messenger and mBlox intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

129.    Plaintiffs and the Aggregator Class suffered loss as a direct result of the conduct of VeriSign, m-Qube, Mobile Messenger and/or mBlox.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Louis Jiran and Delores Gresham, on behalf of themselves and the respective Classes, pray for the following relief:

      a)    Certify this case as a class action on behalf of the Classes as defined above and appoint Louis Jiran and Delores Gresham Class Representatives, and appoint Jay Edelson and John G. Jacobs, as co-lead counsel;

      b)    Declare that the actions of AT&T, as set out above, as well as in other respects, constitute a breach of contract;

c)     Declare that the actions of AT&T, as set forth above, as well as in other respects, constitute a violation of California Public Utilities Code § 2890 and California Business & Professions Code § 17200 *et seq.*

d)     Enter judgment against AT&T for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct, and if its conduct is proved willful, award Plaintiffs and the AT&T Class exemplary damages;

e)     Declare that the actions of VeriSign, m-Qube, Mobile Messenger and mBlox, as set out above, constitute unjust enrichment, tortious interference with a contract, and a violation of California Business & Professions Code § 17200 *et seq.*

f)     Enter judgment against VeriSign, m-Qube, Mobile Messenger and mBlox for all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct, and if its conduct is proved willful award Plaintiffs and the Aggregator Class exemplary damages;

g)     Award Plaintiffs and the Classes reasonable costs and attorneys' fees;

h)     Award Plaintiffs and the Classes pre- and post-judgment interest;

i)     Enter judgment for injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes;

i)     Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 16, 2007

LAW OFFICES OF TERRY M. GORDON

By: _____
TERRY M. GORDON
One of the Attorneys for LOUIS JIRAN
and DELORES GRESHAM, individually
and on behalf of two classes of similarly
situated individuals

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
- 30 -

1  Craig M. White (Pro Hac Vice)
   Brent R. Austin (SBN 141938)
2  Chung-Han Lee (SBN 231950)
   WILDMAN, HARROLD, ALLEN & DIXON, LLP
3  225 West Wacker Drive, Suite 2800
   Chicago, Illinois 60606
4  Telephone: (312) 201-2000
   Facsimile: (312) 201-2555
5
6  Jeffrey L. Fillerup (SBN 120543)
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
7  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
8  Telephone: (415) 356-4600
   Facsimile: (415) 356-4610
9
   Attorneys for Defendant MBLOX, INC.
10

11         SUPERIOR COURT OF THE STATE OF CALIFORNIA

12            FOR THE COUNTY OF SAN FRANCISCO

13
   LOUIS JIRAN and DELORES GRESHAM,                Case No. CGC 07-468268
14  individually and on behalf of a class of similarly
   situated individuals,                          DEFENDANT MBLOX, INC.'S ANSWER
15                                                 AND AFFIRMATIVE DEFENSES TO
             Plaintiff,                            COMPLAINT FOR DAMAGES AND
16                                                 INJUNCTIVE RELIEF
   vs.
17                                                 JURY DEMAND
   AT&T MOBILITY, LLC d/b/a The New AT&T
18  f/k/a CINGULAR WIRELESS, a Delaware
   limited liability company, VERISIGN, INC., a
19  Delaware corporation, M-QUBE, INC., a
   Delaware Corporation, MBLOX, INC., a
20  Delaware corporation, MOBILE MESSENGER
   AMERICAS, INC., a Delaware corporation,
21
             Defendant.
22

23         Defendant, MBLOX, INC. ("Defendant" or "mBlox"), by and through its attorneys of record,

24  answers Plaintiffs LOUIS JIRAN and DELORES GRESHAM's unverified complaint as follows:

25         Defendant mBlox generally denies each and every allegation of Plaintiffs' unverified

26  Complaint pursuant to California Code of Civil Procedure § 431.30. Defendant mBlox denies that it

27  has injured or damaged Plaintiffs in any manner or amount whatsoever, and further denies that

28  Plaintiffs are entitled to recover any relief whatsoever from mBlox. This answer to the unverified

                                            1

1    Complaint is filed without prejudice to Defendant's right to file an amended answer, including

2    additional affirmative defenses and/or cross-complaints, after conducting discovery.

3        For its separate and distinct affirmative defenses, without conceding that it bears the burden of

4    proof or persuasion as to any of the issues raised in these defenses, Defendant alleges as follows:

5                       **AFFIRMATIVE DEFENSES**

6                       First Affirmative Defense

7        The Complaint, and the alleged claims for relief therein, fails to state a claim against

8    Defendant upon which relief can be granted.

9                      Second Affirmative Defense

10        The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

11    doctrine of waiver.

12                       Third Affirmative Defense

13        The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

14    doctrine of unclean hands.

15                      Fourth Affirmative Defense

16        The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

17    doctrine of estoppel.

18                      Fifth Affirmative Defense

19        The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

20    doctrine of laches.

21                      Sixth Affirmative Defense

22        Defendant is informed and believes, and thereon alleges, that Plaintiffs' injuries, losses, and/or

23    damages, if any, were not caused by Defendant, but rather were caused partially or in whole by the

24    fault of himself or a third party for which Defendant is not responsible.

25                      Seventh Affirmative Defense

26        Defendant alleges that Plaintiffs have failed to join indispensable parties necessary for the just

27    adjudication of this matter.

28

1                         Eighth Affirmative Defense

2      The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

3  doctrine of accord and satisfaction.

4                         Ninth Affirmative Defense

5      The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, because

6  the claims have been released.

7                         Tenth Affirmative Defense

8      Plaintiffs' claims are barred by the pertinent statutes of limitations, including, but not limited

9  to, California Code of Civil Procedure §§ 335.1, 337(a), 337(2), 337(3), 338(a), 339(1), 339(3) and

10  343, and the pertinent limitation periods (whether by common law or statute) of the United States and

11  of each state in which any of the alleged claims of Plaintiffs, the putative class members and the

12  putative subclass members arose.  Defendant reserves the right to seek leave to amend this paragraph

13  to state additional affirmative defenses, if and when, for example, this Court issues any Order

14  regarding class certification and/or otherwise recognizes the claims of any person other than the

15  named plaintiffs herein.

16                       Eleventh Affirmative Defense

17      The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, because

18  Plaintiffs failed to mitigate damages they allegedly suffered.

19                       Twelfth Affirmative Defense

20      The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

21  doctrine of election of remedies.

22                       Thirteenth Affirmative Defense

23      The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

24  voluntary payment doctrine.

25                     Fourteenth Affirmative Defense

26      The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, because

27  Defendant's performance of its obligations, if any, was excused or prevented by the Plaintiffs and the

28  alleged class and subclass members' conduct and/or the conduct of third parties, and the prior material

1    breach of their obligations.

2                         Fifteenth Affirmative Defense

3          The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, because

4    Plaintiffs and the alleged class and subclass members have not suffered any injury or damage

5    (monetary or otherwise) as a result of any action taken by Defendant.

6                         Sixteenth Affirmative Defense

7          The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, by the

8    application of the economic loss doctrine.

9                         Seventeenth Affirmative Defense

10         With respect to each and every allegation of the Complaint as they related to the request for

11   class certification, class certification is not appropriate because there is a lack of:

12         (a)      numerosity;

13         (b)      commonality or community of interest;

14         (c)      typicality;

15         (d)      a reasonably ascertainable class;

16         (e)      adequate representation;

17         (f)      appropriateness of relief to the putative class a whole;

18         (g)      predominance of common questions over questions affecting individual class members;

19         (h)      substantial benefit to the litigants and the Court;

20         (i)      superiority of a class action to other available methods for fair and efficient

21   adjudication;

22         (j)      impracticality of joinder of all putative class members.

23                         Eighteenth Affirmative Defense

24         Putative class members have the ability to prosecute individual actions.

25                         Nineteenth Affirmative Defense

26         The Complaint, and the alleged claims for relief therein, is barred, in whole or in part, because

27   Plaintiffs consented to the acts and omissions of which they now complain.

28                         Twentieth Affirmative Defense

                                              4

1    Plaintiffs and the alleged class and subclass members' claims for equitable relief, including

2  their claims for restitution and injunction, are barred because Plaintiffs, members of the putative class

3  and subclass have an adequate remedy at law.

4    WHEREFORE, Defendant mBlox prays for entry of judgment as follows:

5    1)    That the Complaint be dismissed in its entirety with prejudice;

6    2)    That Plaintiffs take nothing by way of the Complaint;

7    3)    That Defendant mBlox recovers its costs; and

8    4)    For such other and further relief as this Court deems just and proper.

9                            **JURY DEMAND**

10    Defendant mBlox demands trial by jury on all claims so triable.

11

12  DATED: December 31, 2007         LUCE, FORWARD, HAMILTON & SCRIPPS LLP

13

14                            By: _____

15                                Jeffrey L. Fillerup
                                  Attorneys for Defendant MBLOX, INC.

16

17

301026201.1

18

19

20

21

22

23

24

25

26

27

28

---
5

**CERTIFICATE OF SERVICE**

I, LEE ANN L. ALLDRIDGE, declare that:

I am at least 18 years of age, and not a party to the above-entitled action. My business address is 50 Fremont Street, 20th Floor, San Francisco, California 94105, Telephone: (415) 591-7500.

On January 2, 2008, I caused to be served the following document(s):

**NOTICE OF REMOVAL**

by enclosing a true copy of (each of) said document(s) in (an) envelope(s), addressed as follows:

☑ BY MAIL: I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service. I know that the correspondence is deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed, and with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at San Francisco, California.

☐ BY PERSONAL SERVICE: I caused such envelopes to be delivered by a messenger service by hand to the address(es) listed below:

☐ BY OVERNIGHT DELIVERY: I enclosed a true copy of said document(s) in a Federal Express envelope, addressed as follows:

☐ BY FACSIMILE: I caused such documents to be transmitted by facsimile transmission and mail as indicated above.

| | |
|---|---|
| Terry M. Gordon, Esq.<br>LAW OFFICES OF TERRY M. GORDON<br>Three Harbor Drive, Ste. 215<br>Sausalito, CA 94965<br>**Telephone: (415) 331-3601**<br>**Facsimile: (415) 331-1225**<br>*Attorneys for Plaintiff* | John Blim, Esq.<br>Jay Edelson, Esq.<br>Myles McGuire, Esq.<br>BLIM & EDELSON, LLC<br>53 West Jackson Blvd., Suite 1642<br>Chicago, Il 60604<br>**Telephone: (312) 913-9400**<br>**Facsimile: (312) 913-9401**<br>*Attorneys for Plaintiff* |
| John G. Jacobs, Esq.<br>Bryan G. Kolton, Esq.<br>THE JACOBS LAW FIRM, CHTD.<br>122 South Michigan Avenue<br>Suite 1850<br>Chicago, IL 60603<br>**Telephone: (312) 427-4000**<br>**Facsimile: (312) 427-1850**<br>*Attorneys for Plaintiff* | Ronald L. Johnston, Esq.<br>Angel L. Tang, Esq.<br>ARNOLD & PORTER, LLP<br>777 South Figueroa Street, 44th Fl.<br>Los Angeles, CA 90017<br>**Telephone: (213) 243-4000**<br>*Attorneys for VeriSign and m-Qube, Inc.* |

DRINKER BIDDLE & REATH LLP<br>50 Fremont Street, 20th Floor<br>San Francisco, CA 94105

SF1\393729\1

1

Jeffrey L. Fillerup, Esq.
LUCE FORWARD HAMILTON &
SCRIPPS, LLP
Rincon Center II
121 Spear Street, Suite 200
San Francisco, CA  94105-1582
Telephone: (415) 356-4600
Facsimile: (415) 356-4610
*Attorneys for mBlox, Inc.*

Craig M. White, Esq.
Brent Austin, Esq.
Chung-Han Lee, Esq.
WILDMAN HARROLD ALLEN &
DIXON, LLP
225 West Wacker Drive, 28th Floor
Chicago, IL 60606-1229
**Telephone:  (312) 201-2000**
*Attorneys for mBlox*

James Cooper, Esq.
ARNOLD & PORTER, LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
**Telephone:  (202) 942-5014**
*Attorneys for VeriSign and m-Qube, Inc.*

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on January 2, 2008 at San Francisco, California.

LEE ANN L. ALLDRIDGE

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1\393725\1

2